**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

OCT 1 2 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| SGT. RICHARD CORDER and DHARMA CORDER, individually and on behalf of all others similarly situated, § § § § | |
| Plaintiffs, § § | |
| v. § § | Civil Action No. **W11CA264** |
| BBG COMMUNICATIONS, INC.; BBG GLOBAL AG, a limited liability company; and DOES 1 through 10, inclusive § § § § § | |
| Defendants § | |

---

### CLASS ACTION COMPLAINT

---

Plaintiffs SGT. RICHARD CORDER and DHARMA CORDER ("Plaintiffs"), by and through the undersigned counsel, file this Class Action Complaint for violation of laws stated herein on behalf of themselves and all others similarly situated throughout the United States against Defendants BBG COMMUNICATIONS, INC. and BBG GLOBAL AG (referred to herein as "BBG") and DOES 1-10 (collectively, "Defendants"). Plaintiffs hereby allege, on information and belief except for information identified as based on personal knowledge, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, as follows:

### I.    NATURE OF ACTION

1.      This case is a simple demand by members of our armed forces and their families for refunds from BBG, a phone company that has uniformly overcharged them. Since 2007 tens if not hundreds of thousands of U.S. troops have been at the Leipzig, Germany airport where

U.S. troop flights refuel any many of them overcharged for phone calls, even though they areUnited States military personnel both going to and coming back from military combat in Iraq and Afghanistan and this is their only opportunity to contact their relatives.     The Defendants operate or provide services for a bank of a significant number of pay telephones located in the secured military lounge area at that airport.  Because this is a secured military area, it can only be accessed by military personnel. BBG has rigged the phones so that troops who use the phones are charged $41 at a minimum for calls, even if the call only lasts a matter of seconds. This scheme has allowed the Galicot family that owns BBG to pocket millions of dollars from our troops. The troops want their money back.

2.     Defendants have intentionally programmed the pay telephones located in this secured military area so that they cannot accept forms of non-cash payment other than credit and debit cards, including military-sold calling cards.  Because these servicemen and women are just coming back from or heading out to long tours of duty, they in all likelihood have no change to make a coin-operated telephone call.  Thus, there is only one phone bank they can use to call their loved ones and tell them they are leaving or coming home, and they have no viable option other than to use a credit or debit card to pay for the call.

3.     Defendants are responsible for preparing the art work on these phones and either do so or approve its use from their offices in the United States.  Nowhere do Defendants disclose on the telephones the fees they impose, or warn servicemen and women in advance the exorbitant amounts they will be charged, even for a call lasting just a few seconds, or even clearly and conspicuously tell them how to find out the fees.  The Plaintiffs, for example, were charged over $41.00 for a four-second telephone call -- *a charge that works out to a fee of over $615.00 a minute*!  Moreover, BBG has instructed the agent operator representatives, including

Centris Information Services ("Centris") out of Longview, Texas, not to disclose automatically the amount of fees charged, unless affirmatively asked to divulge what the charge may be – even though they know at the outset the minimum charge to make a call from this phone bank will be over $40.00. This illegal and unconscionable conduct is in violation of the laws stated herein.

4.       BBG specifically targeted this bank of phones, previously operated by one of its joint venture partners, so that they could control them, direct their conduct at military personnel and charge the outrageous fees they unilaterally impose. BBG knew these troops were vulnerable as few if any would have proper coins much less cell phones that would work in the area upon returning from combat zones. Even within BBG this conduct was challenged as improper. But putting profits over any sense of responsibility, duty or fairness, BBG's officers including the Galicot family members and others chose to impose unconscionable fees on military personnel on what was likely to be their first or last direct American contact in months, if not years. Defendants have made millions from this scheme, allowing their officers and directors to live in mansions while soldiers from Ft. Hood and elsewhere were forced to use their limited incomes and resources while serving our country on multiple deployments to make such calls.

5.       Defendants conveyed, and continue to convey, these deceptive claims, fail to disclose material information, and charge such unconscionable amounts. There is not so much as a simple sign to warn the troops what will happen once they use a credit card to make a call home. As a result of their conduct and the lack of any meaningful choice provided to military personnel, Defendants have been able to charge or profit from unconscionable price premiums for calls made or paid for by Plaintiffs and other Class members from this particular telephone bank.

3

6.     Plaintiffs bring this action on behalf of all military personnel in the United States who, during the relevant time period, made a telephone call using a credit or debit card from the secured military waiting area at the Leipzig, Germany airport using a BBG operated telephone.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 18 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the class is a citizen of a state different from any Defendant, and in which the matter in controversy, including all forms of charges and fees, exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.  Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5).  Plaintiffs are citizens of the State of Texas, whereas, as set forth herein, BBG can be considered a citizen of California.  Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).  Furthermore, Plaintiffs allege that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

8.     Venue in this District is proper pursuant to 28 U.S.C. §1391(b) because Plaintiffs and many Class members are located in and assigned to this District.

## III.     PARTIES

9.     On personal knowledge, Plaintiffs Sgt. Richard Corder and Dharma Corder are individual consumers over the age of eighteen.  They reside and are citizens of Texas.  Sgt. Corder is based at Ft. Hood.  As alleged further below, Sgt. Corder made a call to his wife

Dharma from the Leipzig, Germany waiting lounge as he was heading off to military combat in Iraq in May 2011. He used his family's joint account VISA debit card to make that telephone call, as he had no option but to use a credit or debit card. The call lasted four seconds, as he reached his wife's cell phone voicemail. BBG charged them $41.14 for that four-second telephone call. There were no disclosures on the phone that indicated the outrageous fees BBG would impose on military personnel that used those phones. Mrs. Corder has tried to dispute this charge with BBG, including sending a formal demand letter to BBG on or about July 10, 2011 on behalf of herself and other affected Class members. BBG has failed and refused to respond to that demand. During the relevant class period, Plaintiffs paid a price premium for such a call, and would not have paid a price premium if they had been made aware of the true facts. The defendants however have designed the scheme to keep our troops from knowing that at a minimum they will be charged $41 for a call even if it is, as in this case, only a 4 second call. The defendants knew that if our troops knew the cost of the calls in all likelihood they either would not call home or try to find an alternative, even if one was not realistically available. Plaintiffs would not have paid the prices that they did, if they would have used the phone at all, had the true facts been disclosed on the pay phone. As a result of being forced to pay such charges from their joint account, Plaintiffs have been injured in fact and lost money or property as a result of the acts and practices of Defendants as detailed below.

10.     Defendant BBG Communications, Inc. ("BBG Communications") is a corporation with its alleged principal place of business for consumer purposes being located at 511 E. San Ysidro Blvd., #1770, San Ysidro, California, but its official corporate headquarters and principal place of business registered with the California Secretary of State is located at 1658 Gailes Blvd. Suite B, San Diego, California. BBG and its affiliated companies (which include International

Satellite Communications) are part of a privately held group of companies owned and operated by the Galicot family based in San Diego, California and Tijuana, Mexico, either directly or through fictitious or alter ego shell corporations and trusts they control, all of whom have made significant monies based on this scheme.

11.     Defendant BBG Global AG ("BBG Global"), is merely an off shore front for BBG.   It is a shell corporation that is affiliated with and/or the alter ego of BBG Communications, Inc.  While its offices are allegedly located in Baar, Switzerland, as detailed below, its primary officers or authorized signatories are Rafael and Gregorio Galicot, both residents of La Jolla, California.  In addition, most of its employees and operations, including the decision to acquire and operate this particular phone bank and impose the fees that are charged, were and are carried out of offices in San Diego, California, and most of the funds acquired are funneled through a bank account located in San Diego, California.

12.     At all times relevant herein, BBG's subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of BBG, and at all times relevant herein, each was acting within the purpose and scope of that agency and employment.

13.     Contractors who operated in Leipzig, Germany, as well as their respective employees, and the operators working on BBG's behalf by agreement with Centris Information Services out of Longview, Texas, also were BBG's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment as they received and acted at the direction of and instruction from BBG.

14.     Defendants named herein as DOES 1-10 are negligently or otherwise legally responsible in some manner for the occurrences herein alleged in that the injuries and damages

as hereinafter alleged were proximately caused by the conspiratorial conduct between these individuals or entities.

15.     Whenever reference in this Complaint is made to any act by Defendants or their subsidiaries, affiliates, distributors, retailers, joint venturers, and other related entities, such allegations shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of BBG committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of BBG while actively engaged in the scope of their duties and engaged in a conspiracy to do so.

## IV.     FACTUAL ALLEGATIONS

16.     BBG operates the only phone bank in the secured military area at the Leipzig, Germany airport, where U.S. military personnel disembark during refueling of planes heading to Iraq and Afghanistan, or are returning from tours of duty in Iraq and Afghanistan back to the United States.   These phones are only, but continually, being used by thousands of military personnel to let their family members know when they are leaving to start their tour of duty in Iraq and Afghanistan or are coming home, since typically they are not able to share that information when they are in a combat area.

17.     On personal knowledge, on May 25, 2011 Sgt. Richard Corder deployed to Iraq from Ft. Hood, Texas.  On or about that day he tried to call his wife from the waiting area at the refueling stop at Leipzig, Germany.  He deplaned and went to the secure area set up for U.S. military troops.  In the waiting lounge he called his wife's cell phone and left a four-second voice message on her voicemail.  Because he could only use a credit or debit card to make such a call, he used their VISA check card, which is linked to their joint account.  There were no disclosures on the phone of the fees BBG would automatically charge or that any call would cost a minimum

of $40.00 per telephone call, nor any clear and conspicuous instructions on the phone how to find out such charges. Due to the way they have set up banking online alerts, soon after that call was completed Mrs. Corder was notified via email of three different charges, two for a $41.14 amount and one of $0.95 on their joint account from a company called BBG. They had no previous dealings with BBG. According to her bank such charges were imposed from the United States. The final amount posted for such charges was $41.14. Upon further investigation, she discovered this charge was for the four-second voicemail message left on her cell phone voicemail by her husband before he left for Iraq.

18.     On personal knowledge, on or about May 26, 2011, as there was no contact information on the charge record, Mrs. Corder went on-line and discovered a telephone number, as well as many hundreds and hundreds of complaints, about BBG. She called to dispute the charges for a four-second voicemail from her husband. She found an address and phone number for BBG in San Diego, which she tried on two consecutive days. On the second day she reached a BBG representative, who gave her a 1-800 number to call to dispute the charges. When she contacted the number, the representative asked for the debit card number for the account upon which the charges were made. She explained to him that her husband was in Iraq and she did not know his specific check card number. The representative then said that even though she had the time, date, location of the call, duration of the call, the name of the person whose card was used and the amount charged, there was nothing they could do without the card number. She has disputed these charges with her bank but the issue has not been resolved. In addition, on or about July 10, 2011, she sent a demand letter by certified mail to BBG's corporate headquarters in San Diego, asking for relief not only for her but for other similarly situated military personnel. BBG has failed to respond to that letter.

19.     This is not an isolated circumstance, but is the practice undertaken by BBG targeted at those who serve our country with distinction.  BBG has received similar calls from service personnel and their families nationwide complaining of such charges, but has consistently refused to fully refund such amounts.  Because BBG maintains or has access to records maintained by Centris showing the telephone from which a call is made, such records can show which calls have been made from the phone bank in question. These calls were tracked by Centris in Longview, Texas.  Centris provided software for the billing and operators for the operation of the telephone bank in question, operating at the direction and instruction of BBG.

20.     Apparently, BBG charges a minimum of $40.00 to make calls from that particular phone bank -- more than it claims it charges other consumers who make calls from Europe according to its pricing charts, even those using BBG-controlled phones – based on consistently imposing a $15.00 "connection fee" and a minimum charge of $25.00 for five minutes, no matter how short the telephone call actually is.  Nowhere on the phone does BBG disclose these minimum charges even though they are uniform, even though it would simple to put up a sign that says "NOTICE: All calls from this phone will cost at least $40.00 for up to five minutes, no matter how short the call", as has been done in other locations, and even though BBG is in control of the artwork placed on these phones.

21.     The following is a sample of the complaints lodged by service personnel and their families over this outrageous conduct, all telling the same story of anger and outrage that such predatory conduct has continued unchecked against our fighting forces:

> My husband didn't get scammed by BBG from some 5 star resort somewhere in the tropics, we can't afford that.  He is a US Marine, coming home from Iraq after being deployed for 1 year.  He called home from a pay phone during a layover in Germany, and we got charged 108 USD for a 10 minute phone call. Do you think we deserved to be charged that much?

He was not the only one using those pay phones to call home either. His whole unit, which consists of over 150 Marines, were there as well, and according to him, half of them were using those pay phones to call home. Some of them were on the phones longer than 10 minutes. I am sick to my stomach thinking about how much money this company has taken from all those Marines. And trust me, they don't make millions, and 95 percent of them can't afford vacations to the tropics.

###

I am a US Marine and half our unit used this stupid phone, were all disputing it to our Banks, I hate that company.

###

My story is the same. I am in the National Guard and my unit was deployed to the Middle East with a refueling stop in Germany. We didn't want to be there. were [sic] didn't ask to be there. I only had $20 in my account. I was charged $50 twice for one phone call. My next check went directly to rent and bills before I could even touch it. When I caught up, I have $400 in overdraft fees. Imagine your Platoon Sergeant having to order another soldier to give you money for shaving cream. I was the first to notice, but over 50 soldiers from my company alone were also ripped off by this company. When I called the service number they told me I should have known to speak to the operator to find out about the hidden fees. I said nothing was posted, nor did it give me the option to speak to an operator. He said that you have to know to press 0 when it tells you to press 1 for credit card calls. I said "So the only way to not get ripped off by this is to either have been ripped off before, or know you're about to get ripped off". He said it was something along those lines (they can't agree with you). Now I'm $400 shorter than I should have been for sending Christmas presents back home.

###

I was taken for $42 while traveling back from Iraq on R&R. Our chartered military flight stopped at an airport in Germany to refuel. The only phones available were credit card phones that used International Satellite Communications service. I got a rate quote from the phone of 9 euros for the first minute and 4 euros for every subsequent minute. I was actually charged a $15 connection fee and $5.50 per minute for a minimum of 5 minutes. I contacted the company and they agreed as a "first time customer" to refund $15.

10

###

My story is the same as all the ones you read on line.  I even talked to the same Brian Cervantes.  My complaint is being misquoted on the rates.  I thought the 9 euro call was expensive but was shocked to see the $42 charge.  I am also very concerned about the military angle.  The R&R flights stop in Germany probably every day or at least several times a week.  There are a lot of young enlisted soldiers who are unknowingly being scammed for a lot of money.  At the airport we stopped at there were no other options except getting on line and sending email.  I recommend you try to tie in the fact this company is scamming our young enlisted military.  These soldiers, sailors, airmen and marines are coming home from Iraq and Afghanistan and should not be scammed just because their plane lands at an airport with this phone service.

###

My story is the same, we were being deployed to the middle east, and stopped in germany, I used the phone to make a short phone call home to my wife to let her know we had touched down in germany and all was well, she didn't even pick up and I left a voicemail, when arriving in country I tried to use my card only to get a "insufficient funds", come to find out my card was charged 4 times for that 30 second phone call amounting in over $200.00, I'm still overdrafted, had to borrow money to buy a bar of soap and some shower shoes, and waiting having to wait until payday now with no money, please spread the word to any soldiers airmen and marines going overseas to NOT USE THESE PHONES! it is sad that any company would target us military so blatantly! something should be done about this!

###

My husband was on his way home for R&R from Afghanistan and stopped in Germany.  He called home to tell me his flight info and when to pick him up from the airport.  We talked for a whole 2mins and 16secs and were charged $42.00!!!!!!!!!!!!!!  Are you fricken kidding me!!!!!!!!!!!!!!!  This is BS!!!!!!!!!  How in the world do they expect our soldiers to have their family waiting for them when they arrive if they dont have the info till they get there.  I cant believe this crap!!!!!!!!  BBG has lost their minds!!!!!!!!!!!!!  Thanks alot BBG for ruining my day :-(

11

###

My fiancé is on his way to the middle east and this just happened to us last night. he stopped in germany to refuel we didnt even get to actually TALK i didnt even know he'd tried calling till he told me and we got charged 47.60.  i wish there was something we could all do about this because now we are left with 3 dollars and of course like all soldiers he is going to need things as soon as he gets to his home base.  its really sad that this happens to people trying to serve their country but it does relieve my mind a little to know he/we werent the only ones scammed.

###

Robbed by BBG as well.  On my way to the combat zone in Iraq from Ft. Hood, TX with a brief layover in Liepzig, Germany.  While in Liepzig, the **only phones available** were the ones in the "secure zone" of the terminal meant for US

Soldiers traveling to/from either Iraq or Afghanistan.  No carrier name was on these phones, nor was there any sort of "price per minute" on or near the phones either.  Attempts to use an AT&T Calling Card on these phones proved fruitless, because the only thing they would take was a credit card.  Made a quick 4 minute call from Liepzig to Copperas Cove, TX and received a bill from BBG for $38 instantly.  Four days later, that bill turned into another $80 from straight out of the blue.  Wife contacted the Better Business Bureau, and now we're waiting on word from them to see what can be done to put BBG out of business...completely.

###

I saw a pending transaction on my credit card today for BBG.  Earlier, my husband (a Marine) called me and spoke with me for a couple of minutes from an airport in Germany - the pending charge is $42.00 (lord knows what the final price will be).  This is ridiculous!  And that was after 10 minutes of him trying to get the operator to dial me.  This is usury if I have ever heard of it.  I will most definitely be sending him phone cards during his deployment.

I actually just received the charge, $71.00  Ridiculous.  He is now in Afghanistan and only pays 4 cents a minute.  It is so insulting.

###

Same here hubby made a call from Germany on his way home from the "sand box" already working with the bank on this one. Everyone else that's military remember to go to ACS (consumer services) and let them know what's going on. As well as the FTC has a special unit that only deals with military complaints.

Hopefully the bank will side with us.

### ###

I had the same thing recently happen to my son during his deployment. He stopped over in Germany and called just to let us know he was ok. Being young, first deployment, and unaware of this scam he fell for $150.97 phone bill. Well, I have written to everyone you suggested and I will not sit back and watch our servicemen fight for our country and receive this type of repayment for this services. More people need to step up and write their senators, etc. and let them put an end to this fraudulent scam.

22.     This is also not an inadvertent circumstance.  The contract for operating the pay telephones in the Leipzig airport was previously serviced by Salvador Lombroso as an agent for BBG.  Mr. Lombroso is also located in the United States and works as a restaurateur in the San Diego area.  Mr. Lombroso was paid a commission based on the total revenue generated to BBG by the phones and thereby made significant money from this scheme.  After the Leipzig airport became the main refueling stop for most of the military personnel going to or coming back from Iraq and Afghanistan, the Galicots contacted Lombroso in 2008 and told him they wanted a larger percentage of his contract.  As Lombroso had numerous other business relationships with them, including control of pay telephones in Italy and the San Francisco International Airport, he was in no position to refuse.  He granted them a larger portion of the lucrative commissions received from the military restricted zone of the Leipzig airport.

23.     At some point to be determined in the course of discovery, but approximately during this 2008 period, BBG instructed individuals to rig this phone bank so that it could not accept any calling cards, either pre-paid or even ones purchased by military personnel on military bases, or to permit military personnel to access 1-800 numbers to contact long distance carriers such as AT&T. It was a deliberate move to prey on the troops. Thus, as set up by BBG, service personnel's only realistic option was to use a credit or debit card to pay to use the phone banks to contact their families.  Based on how BBG intentionally programmed these phones,

13

military personnel had no realistic alternative available to them other than not call their loved ones to tell them they were on the way to military combat or shortly returning home. Nowhere on these phones does BBG disclose that it will automatically charge military personnel over $40.00, simply to leave a message or for a 4-second telephone call, using a credit or debit card.

24.    As a result of programming the phones in this way, Defendants have been able to charge unconscionable price premiums and drain money from the bank accounts of military personnel who have limited incomes.  Defendants are aware of numerous complaints over this practice, since, as noted above, they have received similar calls and complaints about these charges, both internally and from military personnel and their families.  Defendants thus have had the above material information in their possession for years, but have not stopped such practices so they can continue to support their personal extravagance at the expense of our troops, being unjustly enriched in the process.

25.    BBG controls the art work on these phones, and could easily post a simple sign that says the minimum fee would be $40.00 for a call of any duration.  They chose, however, not to do so, leaving our soldiers in the dark as to what it will cost merely to call their families to say they are either ready to leave for combat duty or are safely on their way home.  They have also instructed their operator agents, who work either directly for BBG or through Centris, not to divulge this material information unless directly asked for it, and programmed the phones in such a way that it is difficult to even reach someone to ask what the fees would be.  Centris handled the calls from these telephones and maintained call traffic information for these calls in Texas, and received instructions from BBG how to misdirect customer inquiries.  Defendants thus appear to be purposefully withholding and concealing this material information from military personnel.

26.     Defendants apparently decided to place profits before integrity or any sense of good faith, decency or fair dealing, in the programming, advertising, billing and operation of the phones in question.  Plaintiffs and Class members suffered injury and damage as a result in that, among other things, they were charged money for services that were unconscionable and lacked the value for what was provided, and for which they paid a premium.

27.     Such conduct is on-going and continues to this date.  Despite Plaintiffs making a written demand therefor on or about July 10, 2011 to remedy the issues complained of herein to BBG prior to the initiation of this action on behalf of themselves and others similarly situated, Defendants have failed and/or refused to correct and remedy this conduct informally, necessitating this action.

28.     BBG Global AG has and is acting in conspiracy with BBG Communications, Inc. in engaging in the conduct alleged herein, and is an affiliate and alter ego of BBG Communications, Inc.  Jurisdiction can properly be exercised over this company based upon its substantial contacts with the United States.

29.     In a July 9, 2003 complaint filed by BBG Communications and the predecessor of BBG Global, BBG Holdings, Ltd. (Case No. 03-cv-0027 (E.D. TX)), the companies admitted:

> "BBG Comm. and BBG Holdings are well-known, multinational, multifunctional communications companies serving the diverse international markets that include North America, Europe, Japan [Hong Kong], Israel, Latin America and the Caribbean basin.  BBG Holdings contracts with various third parties throughout the world (including foreign telephone companies, hotels, airports, and seaports) to provide internal and external communication and telephones.  BBG Comm. acts as the carrier and international long distance reseller to facilitate the contracts between BBG Holdings and others.  BBG Holdings and BBG Comm. sell millions of dollars of telecommunications services annually."

30.     BBG Global AG is the successor in interest to BBG Holdings.  In addition, the websites for BBG Communications (bbgcommunications.com, bbgusa.com, and bbgcomm.com)

have asserted: "BBG has interconnect and billing arrangements that enable it to directly carry and deliver telecommunications traffic and bill customers in Canada, Germany, Japan, UK and US and in every other country with credit card transactions."  Additionally, the blog site (http://bbg-communications.blogspot.com/) lists all the countries worldwide that BBG Communications has phone service in working in concert with BBG Global AG.  BBG Global also, until recently had an application to operate on file with the FCC where it represented it had no foreign affiliations.

      31.    According to BBG Communications' stated privacy policy located on its website (www.bbgusa.com/bbg/privacypolicy1.php), it claims that BBG Communications and/or its affiliated companies, which would include BBG Global AG, retain credit card information about all customers who use a pay telephone operated by BBG Communications or any related entity, even if the call comes from European Union telephone users making long distance telephone calls from the payphones in question.  In the BBG Communications' Privacy Policy, it states it is the company providing such services, either directly or through companies its controls or is in common control with:

> BBG Communications, Inc. and its affiliates (collectively "BBG"), respect the privacy and values the confidence of our customers, employees and others who entrust us with their personal information.
>
>       ###
>
> BBG provides international telecommunications services, including public telephony, calling card, long distance operator assistance, credit card processing, billing, collection and wireless telecommunication services.
>
> BBG processes casual-use voice services from European Union ("EU") telephone users making long distance calls from payphones and hotels. This process includes the collection of billing information and desired call destination from end users which eventually result in the creation of call detail records and include the date, time, duration, number dialed and billing number. This call

detail information is collected from EU telephone equipment operators, and local and long distance carriers and is used by BBG for calculating commissions and reporting this information via a secured website to sales representatives and customers; otherwise the information is restricted to authorized personnel, technical staff and network administrators.  Call detail records do not contain personally identifiable information. An individual's name and credit card number are collected when calls are billed to a credit card, and BBG processes the payment and charges the caller's credit card. Certain related entities in the EU have also contracted with BBG to provide telecommunications support services and may also submit human resource information to BBG which is used only for internal purposes, stored in a secure location and not shared with third parties. This policy (this "Policy") applies to all Personal Information (defined below) received by BBG regardless of format.  BBG will not share or disclose Personal Information with third parties unless required to do so by law and will establish and maintain business procedures that are consistent with this Policy.

32.     Thus, if this privacy policy is to be believed, at a minimum BBG Global must be an affiliate of BBG Communications, and BBG Communications is jointly and severally liable or is acting in combination and conspiracy with BBG Global, or in fact the telecommunications services in question are provided by BBG Communications.   In addition, if BBG Communications shared credit card data with other companies, they must also be affiliates of BBG Communications in order to comply with this policy.

33.     Even though BBG Communications has asserted that BBG Global is the provider of telephone service, customer telephone calls to (800) 608-0855, (800) 576-2118, and (800) 608-0575, or other toll-free telephone numbers provided by BBG Communications for communications with consumers to complain about a particular charge placed on customers' credit or debit card statements, are domestic-only toll-free telephone numbers that do not put customers in contact with BBG Global.  Consumers are directed to a call center operated by BBG Communications or one of its affiliates or agents, not BBG Global.  BBG Communications or its agents answer any formal disputes or inquiries from financial institutions or by Class

members for calls made from international pay phones operated by BBG.  If a customer calls and directly requests the name of the entity that provided or billed for calls made from payphones where BBG is the service provider, representatives do not state the company's name is BBG Global.  Customer service representatives, rather, are instructed not to divulge the name or location of the BBG Communications company that is allegedly providing such telephone services "for security purposes" -- though they refuse to say what those purposes are.

34.     Consumers who contact the toll-free telephone numbers provided by BBG Communications and ask for full or partial refunds of charges for international telephone calls are not told they can only obtain such refunds by contacting BBG Global.  In addition, in response to inquiries or complaints by Class members, BBG Communications does not respond that such inquiries or complaints needed to be directed to BBG Global as the responsible party. Rather, customers who complain enough to call center representatives of BBG Communications are given partial refunds for calls originating outside the United States by BBG, regardless of the name of the entity that billed the call or provided such services, or where such calls are made.

35.     BBG Global also appears to be and operates as an alter ego of BBG Communications.  BBG Communications' San Diego, California location is where the office of BBG Global's president, secretary, and other high-level management personnel are located. Both BBG Communications and BBG Global maintain bank accounts at Wells Fargo Bank in California.  When BBG Global pays commissions to agents, it does so out of that bank account.

36.     The BBG Global website (http://bbgglobalch.com/contact.htm) has not listed any contact telephone number for the company, but instead lists a fax number and a contact e-mail address through bbgcomm.com.  Contact emails to the BBG Global website are directed to info@bbgcomm.com, which is a BBG Communications' website, and which URL is registered

to BBG Communications.   BBG Global's agents also use the @bbgcomm.com domain extension.   BBG Global's claimed employees, such as Brian Rhys, Delma Andrabe, Clara Martinez, David Adler and Allen Adler, all claim to have worked in San Diego, California on their LinkedIn accounts.   BBG Global states in its privacy policy its servers are located in California and Las Vegas, Nevada.

37.   On the other hand, the local office of BBG Global in Switzerland is not staffed on a daily basis.  The alleged "worldwide headquarters" of BBG Global consist of several offices in an office/apartment complex that only have a sign taped to the door identifying the office. The mailbox for BBG Global does not identify the company name BBG Global on the mailbox at all, but instead lists the name "BBG Global Management GmbH".  There is no outside signage indicating where BBG Global is actually located within Bahnhof Park No. 4 in Baar, Switzerland.

38.   At no point in Class members' use of the telephone bank in question, in any advertising, or in any billing for such calls, is there any mention of BBG Global.   BBG Communications appears responsible for setting all amounts charged to customers who use the telephones in question, and is also responsible for creating all of the art work, disclosure, advertising or marketing statements, no matter where the payphone is located.

39.   The point of dissemination of advertisements, policies, call flow designs, and call center scripts for payphones where BBG Communications is the operator service provider also appears to emanate from BBG Communications' headquarters in the U.S. rather than Switzerland or Leipzig, Germany.

40.   Gregorio Galicot is a resident and citizen of the United States of America and is thus subject to jurisdiction and all laws of the United States of America.  Gregorio Galicot is an

officer, director or employee of BBG Communications.  Gregorio Galicot is also an officer, director or employee of BBG Global.

41.    Rafael Galicot is a resident and citizen of the United States of America and is thus subject to jurisdiction and all laws of the United States of America.  Rafael Galicot is an officer, director or employee of BBG Communications.  Rafael Galicot is also an "authorized signatory" of BBG Global.

42.    To the extent Gregorio and Rafael Galicot conduct any business for BBG Global, they do so primarily from the United States and not Switzerland.  Gregorio and Rafael Galicot collectively own a 95% share of BBG Global through their family trusts.  The current majority owners of both BBG Communications and BBG Global are the Rafael and Kayla Galicot Family Trust and the Galicot Nobel Family Trust, both with an address of 1658 Gailes Blvd., Suite B, San Diego, California.  Gregorio and Rafael Galicot and BBG Communications are thus "general managers" of BBG Global, such that jurisdiction is properly exercised over BBG Global by virtue of their presence and operations in the United States.

43.    As further evidence of the lack of corporate formality undertaken by the Galicots, the trustee of the irrevocable trust that was recently transferred ownership of FairCall Communications, one of BBG's affiliated companies, is David Abeles, who is the brother-in-law of Gregorio Galicot.  As with the other ownership trusts, this irrevocable trust is for the benefit of the Galicots' children.  David Abeles has no experience in the telecommunications industry, yet is the person who effectively controls the ownership of this company.

44.    BBG Communications claims to facilitate the contracts that BBG Global or BBG Holdings, Ltd. (the predecessor of BBG Global) allegedly entered into with third parties. BBG Communications also claims it provides accounting, bill payments, legal support, customer

support, bookkeeping, database management, collection, and administrative services to BBG Global, but does out of San Diego, California -- leaving open the question what, if anything, BBG Global does other than operate as a front organization designed to avoid being held responsible for such unconscionable practices. BBG Communications' privacy policy selects San Diego, California as the forum for resolving any complaints by any consumer arising anywhere in the world regarding any of the BBG entities' violations of BBG Communications' published privacy policy. In addition, Goran and Michel Alexiev, alleged consultants for BBG Global, travelled to San Diego in May 2003 to enter into an agreement with BBG Holdings, even though the agreement is purportedly between BBG Holdings and the Alexievs' company in the Czech Republic. That consulting agreement contains a choice-of-law provision that selects California law as the governing law, and expressly selects San Diego, California as the forum for bringing any disputes arising under the agreement. Even the joint venture agreement between BBG Global and BBG Communications contains a choice-of-law provision that selects California law as the governing law, and expressly selects San Diego, California as the forum for any disputes arising under the agreement (which is illusory, since the owners, officers and managing agents of both companies are the same persons and thus would not sue themselves). Thus, BBG Global has consented to, and thus reasonably could be expected to be subject to, being sued in the United States and governed by the same laws with respect to any customers to whom it allegedly provides services that reside in the United States.

## V.  CLASS ALLEGATIONS

45.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") and seek certification of the claims and certain issues in this action pursuant to the applicable provisions of Rule 23, on behalf of all military personnel in the United States

who, since at least during the past four years (and potentially earlier, depending on date determined in discovery), made a telephone call from the secure military area of the Leipzig Germany airport from the phone bank operated by BBG or its affiliates and agents (the "Class").

46.     Defendants' practices and omissions of material fact were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.  All members of the Class were and are similarly affected by having used and been overcharged for using the pay telephones in question.  The misrepresentations and lack of any clear and conspicuous disclosure is the same, the amounts charged each Class member are uniformly calculated, the directions provided to BBG operators was the same and based on a uniform script, and the relief sought herein is similar for the benefit of Plaintiffs and members of the Class.

47.     The Class is so numerous that joinder of all members would be impractical. Based on the tens if not hundreds of thousands of military personnel who have gone into and out of the Leipzig airport on their way to and from Iraq and Afghanistan over the last several years and had access only to this particular phone bank, the number of affected military personnel would likely be in tens if not hundreds of thousands, thereby making joinder impossible. Through its records, Defendants can identify all telephone calls made from the telephone bank in question and whose credit or debit cards were charged for calls from that phone bank, and thus should be able to identify the number of Class members.

48.     The questions of law and fact common to the Class exist that predominate over questions affecting only individual members are set forth throughout this Complaint.

49.     The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as all their claims arise from the same course of conduct by Defendants, and the relief sought is common.

50.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.   Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

51.     Certification of this class action is appropriate under FRCP 23(b) because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

52.     Absent a class action, it would be highly unlikely that Plaintiffs or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

53.     Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

54.     Further, given the large number of consumers affected by this practice, even if a consumer would file an individual action, which would be unlikely, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

55.     A class action is both a manageable, fair and appropriate method for the adjudication of this controversy in that it will permit a large number of claims to be resolved in a

single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender and the resolution of the question of the unconscionability of such charges and the impropriety of the disclosures or lack thereof would resolve all the claims asserted herein in one action.

56.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI.     CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

57.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

58.     Plaintiffs, and each member of the Class, formed a contract with Defendants at the time Plaintiffs and the other members of the Class used the pay telephones in question, implied in which is a covenant of good faith and fair dealing that includes Defendants would not impose unconscionable and undisclosed fees in connection with charging military personnel to contact their families where they had no reasonable alternatives.  By the conduct set forth above, Defendants breached such obligations.

59.     All conditions precedent to seeking liability under this claim for breach of contract, including attempts to resolve this issue informally prior to this action and written notice being provided to Defendants, have been performed by Plaintiffs.

60.     As a result of Defendants' systematic breach of contract, Plaintiffs and the Class have been damaged in the amount of the charges imposed upon them or for not receiving the benefit of their bargain.

## COUNT II – FRAUD

61.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

62.     During the time period set forth above and at the pay telephones in question, Defendants uniformly misrepresented and/or failed to disclose material facts about the amount of fees charged to Plaintiffs and the Class members for use of Defendants' pay telephones even though they had an obligation and duty to do so.

63.     The amount of fees charged to Plaintiffs and Class members for using Defendants' pay telephones was material to Plaintiffs and the Class members.

64.     Defendants knew Plaintiffs and Class members were ignorant of the facts regarding the amount of fees charged for the use of Defendants' pay telephones, because as the phones were designed there was no notice of the fees charged on the phone itself, Class members were not advised how to find out what the fees would be, and even those who figured out how to do so received representations that the fees charged were materially less than what were actually imposed.  Thus, Plaintiffs and Class members did not have an equal opportunity to discover the truth regarding the undisclosed fees for use of Defendants' pay telephones.  Defendants were deliberately silent and failed to disclose the material facts of the fees for their pay telephones with the intent to induce the Plaintiffs and Class members to place telephone calls using Defendants' pay telephones and pay the prices uniformly and unilaterally imposed by Defendants.

65.     Plaintiffs and the Class members acted in reliance on Defendants' misrepresentations, omissions and concealments of material facts regarding the amount of fees for using these pay telephones.  Plaintiffs and Class Members suffered injury as a result of acting without knowledge of the undisclosed facts regarding the amount of fees for their pay telephones, entitling them to an award of both compensatory and exemplary damages based on the fraudulent, wilful, outrageous and oppressive conduct engaged in by Defendants.

### COUNT III – ASSUMPSIT AND COMMON COUNT/UNJUST ENRICHMENT

66.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

67.     Based upon the implied contracts created and recognized under principles of assumpsit as a result of the conduct alleged above, Defendants have improperly benefited by monies had and received from Plaintiffs and the Class members as a result of their unlawful acts by receiving excessive revenue derived from the practices alleged in detail above.  Defendants appreciated and/or knew the benefits of the receipt of such excessive revenues and profits.

68.     These excessive revenues and profits have been received by Defendants at the expense of Plaintiffs and members of the Class, under circumstances in which it would be unjust for Defendants to be permitted to retain and be unjustly enriched by such benefits.

69.     Defendants did not provide Plaintiffs or other members of the Class what they bargained for.  By virtue of a written demand made prior to the initiation of this action, Plaintiffs made a demand for the return of such monies, which has been ignored.

70.     Plaintiffs and the Class members are therefore entitled to damages and equitable relief in such amounts as may be determined at trial.

## COUNT IV – DECLARATORY RELIEF

71.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

72.    There currently exists between the parties an actual and on-going controversy regarding the respective rights and liabilities of the parties relating to , *inter alia*, the need for Defendants to accurately disclose or correct disclosure of the fees in question as detailed above, the obligation of Defendants to refund some or all of the charges in question, and/or the need of Defendants to stop charging these amounts and restore some or all amounts that were not required to be paid by Class members based on these misrepresentations and omitted material facts, as alleged in detail above.

73.    Plaintiffs, members of the Class and the general public may be without adequate remedy at law, rendering declaratory relief appropriate in that:

a.    Damages may not adequately compensate the Class members for the injuries suffered, nor may other claims permit such relief;

b.    The relief sought herein in terms of ceasing such practices, providing  full and complete corrective disclosure and/or declaring there is no obligation of Class members to pay such monies may not be fully accomplished by awarding damages or benefits the general military public that is being exposed to such practices; and

c.    If the conduct complained of is not enjoined, harm will result to Class members and the general public because Defendants' wrongful conduct is continuing, claims are unresolved, persons are entitled to the direct monies taken from them, and the obligation for many Class members or members to continue to pay such sums may still be allegedly outstanding.

74.    Class members may suffer irreparable harm if a determination of the parties' rights and obligations is not ordered.

75.    Accordingly, Plaintiffs request the Court issue an order granting the following declaratory relief:

a.    That a judicial determination and declaration be made of the rights of Class members and the corresponding responsibilities of Defendants;

b.    That Defendants be ordered to provide notice in clear and conspicuous language to military personnel of all fees they impose and the true nature of such charges, and to make such charges consistent with their representations or legal obligations so that they can make informed decisions and explore possible alternatives before incurring such fees; and/or

c.    An order declaring Defendants are obligated to pay restitution to all members of the Class as appropriate and/or otherwise pay over all funds BBG wrongfully acquired either directly or indirectly as a result of imposing improper fees under false pretenses and by which Defendants were unjustly enriched, and imposing a constructive trust over such funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief, jointly and severally pursuant to each Count set forth in this Complaint, as follows, as appropriate for each particular Count:

1.    For an order certifying that the action may be maintained as a class action and Plaintiffs' counsel be appointed as Class Counsel;

2.    For an award of equitable relief as follows:

a.    An order preliminarily and permanently enjoining Defendants from

continuing to engage, use, or employ any unfair and/or deceptive business acts or practices as set forth in detail above; and

      b.    An order awarding restitution for out-of-pocket expenses and economic harm and disgorging and restoring all monies that may have been acquired by Defendants as a result of such deceptive acts and/or practices;

3.    For an award of actual, consequential, statutory and/or exemplary damages;

4.    For an award of attorneys' fees;

5.    For pre- and post-judgment interest on any amounts awarded;

6.    For an award of costs; and

7.    For an Order providing such further relief as may be found just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: October 12th, 2011

DUNNAM & DUNNAM, L.L.P.
By: _____ for
Jim Dunnam (Texas Bar No. 06258010)
4125 West Waco Drive
P.O. Box 8418
Waco, TX 76714-8418
Phone: (254) 753-6437
Fax: (254) 753-7434

EMERSON POYNTER LLP
John G. Emerson (Texas Bar No. 06602600)
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058-2610
Tel: (281) 488-8854
Fax: (281) 488-8867

Scott E. Poynter (To Apply *Pro Hac Vice*)
scott@emersonpoynter.com
Chris D. Jennings (To Apply *Pro Hac Vice*)
cjennings@emersonpoynter.com
William T. Crowder (To Apply *Pro Hac Vice*)
wcrowder@emersonpoynter.com
Corey D. McGaha (Texas Bar No. 24058992)
cmcgaha@emersonpoynter.com
500 President Clinton Ave., Ste. 305

Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

THE CONSUMER LAW GROUP
Alan M. Mansfield (CA SBN 125998)
(To Apply *Pro Hac Vice*)
alan@clgca.com
9466 Black Mountain Rd., Suite 225
San Diego, CA 92126
Tel: (619) 308-5034
Fax: (888) 341-5048

WHATLEY DRAKE & KALLAS, LLC
Joe R. Whatley, Jr., Esq. (To Apply *Pro Hac Vice*)
Edith M. Kallas, Esq. (To Apply *Pro Hac Vice*)
Patrick J. Sheehan, Esq. (To Apply *Pro Hac Vice*)
psheehan@wdklaw.com
380 Madison Avenue, 23rd Floor
New York, NY 10017
Tel: (212) 447-7070
Fax: (212) 447-7077

John Mattes, Esq. (Fla. SBN 0468150)
(To Apply *Pro Hac Vice*)
investigativeguy@gmail.com
1666 Garnet Avenue, #815
San Diego, CA 92109
Tel: (858) 412-6081

Attorneys for Plaintiffs